IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

DEBRA HUBBLE,

                   Plaintiff,                                  CV-09-766-ST

           v.                                      OPINION AND
                                                    ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                   Defendant.

_____

STEWART, Magistrate Judge:

## **INTRODUCTION**

       Plaintiff, Debra Hubble ("Hubble"), seeks judicial review of the final decision by the

Social Security Commissioner ("Commissioner") denying her application for Disability

Insurance Benefits under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-433

(2008). This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC §

405(g) and § 1383(c)(3). For the reasons set forth below, that decision is AFFIRMED.

# ADMINISTRATIVE HISTORY

Hubble protectively filed for DIB on June 3, 2003, alleging a disability onset date of January 15, 2003. Tr. 51-53.[1] Her application was denied initially and on reconsideration. Tr. 24-32. On November 18, 2004, a hearing was held before Administrative Law Judge ("ALJ") John J. Madden, Jr. Tr. 261-88, 370-97. The ALJ issued a decision on February 22, 2005, finding Hubble not disabled. Tr. 10-20, 311-21. The Appeals Council denied Hubble's request for review on June 3, 2005 (Tr. 5-8), making the ALJ's decision the Commissioner's final decision.

On August 5, 2005, Hubble filed an action in this court, Civil No. 05-1214-AA, seeking judicial review of the ALJ's decision. On August 8, 2006, based upon the stipulation of the parties, the court issued an order remanding the case for further administrative proceedings. Tr. 327-28. On October 13, 2006, the Appeals Counsel remanded the case to an ALJ for further proceedings. Tr. 329-32. ALJ Madden held hearings on January 9 (Tr. 579-612) and May 22, 2008 (Tr. 613-23). On July 21, 2008, the ALJ issued a decision finding Hubble not disabled. Tr. 294-309. The decision consolidated the current application for DIB filed on June 3, 2003, and a subsequent application filed on June 3, 2005, while the initial application was being reviewed by this court Tr. 297, 331. On May 5, 2009, the Appeals Counsel denied Hubble's request for review (Tr. 289-91), making the ALJ's July 21, 2008 decision the Commissioner's final decision.

/ / /

# BACKGROUND

---

[1] Citations are to the page(s) indicated in the official transcript of record filed on November 20, 2009 (docket # 9).

Hubble was born in 1953 and age 54 at the time of the 2008 hearings before the ALJ. Tr. 51, 534, 618. She has a high school education and past relevant work experience as a medical biller/collection clerk in a doctor's office, service station manager, and as a fast food manager. Tr. 62, 71, 618. She alleges that she is unable to work due to chronic arthritis, degenerative disc disease, musculoskeletal disease, chronic back, spine, and bilateral hip pain, breast cancer in remission, kidney distress, depression, and memory and concentration problems. Tr. 66.

## I.      Claimant's Testimony

### A.      Before Remand

In a function report dated June 12, 2003, Hubble stated that she stopped working on Janaury 15, 2003, because she was laid off. Tr. 56. At that time, she was unable to sit or stand for any length of time and walking was very painful for any distance longer than half a block. *Id*. She had developed kidney problems due to all the anti-inflammatory medication she used. Tr. 63. Pain in her hips and low back made it difficult to walk, sit, drive, or lift. *Id*.

In a series of questionnaires dated September 15 and 16, 2003, Hubble reported that she experienced chronic pain in her hips and spine during most all activities, which was relieved only by laying down and taking anti-inflammatory medication. Tr. 97. She could be active only for 15 to 20 minutes, could walk for about a block before needing rest, and often could not finish grocery shopping or housework because of pain. Tr. 98-99, 102. She prepared her own meals and groomed herself, but required assistance with household chores and engaged in hobbies only for 15 minutes before needing rest. Tr. 99-101, 117. She could not walk, lift, bend, or stand for very long. Tr. 104. She did not necessarily feel fatigue or the need for a nap, but her pain

caused her to frequently sit down and rest in order to relieve the pain. Tr. 116. She had to rest between activities for about 30 minutes. *Id*. When going out in public, someone else drove her. Tr. 117. She had difficulty sleeping due to pain in her hips, back, and hands. *Id*. Due to medication side effects, her memory and comprehension had deteriorated with difficulty focusing, but she still read, crocheted, watched television and listened to the radio. Tr. 103, 119.

In a supplemental disability report submitted November 17, 2003, Hubble reported that she still could not walk or sit for very long, had developed a limp, could no longer exercise, needed help getting in and out of the bathtub, and sometimes needed to sit on a stool to brush her teeth and wash her face because it hurts to bend over the sink. Tr. 120, 122.

On February 1, 2004, Hubble wrote a letter explaining that she took an office job because she thought it would alleviate some of her pain, but that sitting was so painful that she was often in tears. Tr. 130. Even simple tasks such as doing laundry or washing dishes caused her discomfort from being on her feet for very long. *Id*.

At the first hearing on November 18, 2004, Hubble testified that at her most recent job, she found it difficult to walk up and down hallways, bend, or sit for long periods of time. Tr. 271. At that time, she could sit or stand for 15-20 minutes before needing to move to relieve the pain. Tr. 272. Even walking at a very slow pace was difficult, and she often had to take several breaks while walking around the house completing tasks. Tr. 272-73. Most days she was not able to put the dishes in the dishwasher after dinner due to pain. Tr. 273. She found bending, stooping, squatting, and lifting very difficult. *Id*. Recently she had begun experiencing arthritis in her thumbs, making it difficult for her to grocery shop. Tr. 274-75.

Hubble rated her pain as a seven or eight out of 10 on a constant basis.  Tr. 275.  Vicodin decreased her pain slightly for three to four hours.  Tr. 276.  Walking, sitting, or "just maneuvering" while doing everyday activities made the pain worse.  Tr. 277.  While she had good days and bad days, depending on her activity, all days were bad by the end.  *Id*.  She often had to sit in a recliner three to five times a day, if not more.  *Id*.  She believed she could not work because the pain was so distracting that she could not focus.  Tr. 277-78.

During a typical day, she awoke around 7:00 a.m., tried to do the dishes, then sat for 20-30 minutes, dusted or did some light housework, sat and rested again until the pain settled down, and then repeated the cycle for the remainder of the day.  Tr. 278-79.  By the end of the day, she was so stiff and sore that she can hardly put one foot in front of the other to go to bed.  Tr. 279.  Her husband did most of the driving, helped prepare meals and did chores around the house.  Tr. 280.  She could drive a vehicle with an automatic transmission but the manual transmission caused her too much pain.  *Id*.

While her application was pending in this court, Hubble submitted an additional application for disability in June 2005.  Tr. 331.  In a serious of reports submitted in July 2005, Hubble stated that on a typical day she would have a breakfast drink, take her medication, watch television, read, visit with her grandchildren, do a load or two of laundry, fix a small dinner, and watch television or read before going to bed.  Tr. 417.  She often needed to sit while cooking, folding the laundry, and getting dressed.  Tr. 417-18.  She often sat on a bucket to take a shower, though she often found it hard to get up after being seated.  *Id*.  She could prepare only very simple meals and could not iron, vacuum, mop, or do yardwork.  Tr. 419-20.  When she went grocery shopping, it took longer because she used a wheelchair.  Tr. 420.  She could walk about

two car lengths before needing to stop and rest.  Tr. 422.  When leaving the house, she used a cane and a wheelchair when available.  Tr. 423.

She experienced stiffness, aching, and sharp pains all the time, most severely at night. Tr. 425.  Nothing relieved the pain except Xanax to help her sleep.  *Id.*  She could only be active for about five minutes before needing to rest, making it nearly impossible to finish tasks such as cooking and cleaning.  Tr. 426.

**B.**     **After Remand**

After the remand, the ALJ held two hearings.  At the first hearing on January 9, 2008, Hubble testified that she used a cane when her knees and hips became too stiff, such as after doing a lot of walking.  Tr. 595.  By the time she sits after walking, she can hardly get back up again.  *Id.*  She had recently been diagnosed with diabetes and was taking Glucophage, and had also recently increased her Effexor dosage for her depression.  Tr. 595-96.  She was also taking Ziac to manage her blood pressure, Xanax to sleep, and Vicodin and Ibuprofen during the day. Tr. 596-99.  Her pain level on a normal day was an eight or nine out of 10.  Tr. 599.  She could only sit for approximately 10 minutes.  *Id.*  She sat and sometimes slept in a recliner because it did not bother her hips as much.  Tr. 600.  During the day she often had to lie down at least twice.  *Id.*  She thought her depression was related to her physical condition because she was unable do many of the things she used to do.  Tr. 607.

At the second hearing, held on May 22, 2008, Hubble merely confirmed that she had not had gastric bypass surgery.  Tr. 617.

///

///

## II.   Medical Records

Hubble's medical records begin on November 6, 2001, when she reported low back pain, depression, anxiety, and significant weight gain.  Tr. 140.  X-rays taken on November 20, 2001, revealed minimal degenerative disc disease in the lumbar spine and Grade I degenerative spondylolisthesis at L4-L5.  Tr. 143.  On December 3, 2001, she was evaluated for chronic pain, degenerative disc disease, spondylolisthesis, and depression associated with weight gain by her primary care provider, Amy Clegg, FNP.  Tr. 139.  Nurse Clegg renewed her Effexor prescription and added Flexeril and Celebrex.  *Id*.  She also instructed Hubble on several back exercises to help alleviate discomfort.  *Id*.

On December 30, 2002, a mammogram revealed a cluster of faint microcalcifications, necessitating a follow up biopsy.  Tr. 141-42, 536.  At that time, Edward T. McClure, M.D., indicated that Hubble had no other major medical problems.  Tr. 536.  On January 27, 2003, a biopsy revealed early stage breast cancer.  Tr. 149-50, 165, 173-74, 535.  Hubble then received cancer treatment, including radiation and Tamoxifen.  Tr. 155-64.  She completed radiation on April 17, 2003.  Tr. 240.  Subsequent mammogram results have been benign.

On May 15, 2003, Hubble had an initial visit with chiropractor Donald Vradenburg, D.C., for low back pain and degenerative disc disease.  Tr. 197-98.  He performed a neurologic and orthopedic exam, noting that Hubble experienced right cervical and left hip muscle spasms.  Tr. 196.  He changed her medication and ordered x-rays and blood work.  Tr. 195.  The blood work was done on May 22, 2003.  Tr. 201.

On May 27, 2003, a bilateral x-ray of Hubble's hips revealed severe osteoarthritis of the left hip with moderate osteoarthritis of the right hip.  Tr. 171, 199.  Lumbar spine x-rays taken

the same day revealed multi-level degenerative disc disease and severe posterior facet disease in the lower lumbar spine associated with anterolisthesis of L4 and L5. Tr. 172, 200.

Chiropractor Vradenburg's notes for May and June 2003 indicate that Hubble was participating in water aerobics but her hip pain remained the same. Tr. 194-95. He ordered more blood work and follow-up visits. *Id*.

On June 27, 2003, in a "request for medical information" from the Oregon Employment Department ("OED"), chiropractor Vradenburg indicated that Hubble suffered from osteoarthritis, back and bilateral hip musculoskeletal disease, and degenerative disc disease which was severe in the left hip with radicular pain. Tr. 193. He opined that Hubble had been fully disabled since May 2003 due to degenerative disc disease in her left hip. *Id*.

On September 25, 2003, Paul Rethinger, Ph.D, completed a psychiatric review technique form for the DDS, concluding that Hubble has no medically determinable psychological impairment. Tr. 202-16. Dr. Rethinger found Hubble only partially credible because she left work for reasons other than disability and her activities of daily living did not support the severity of her complaints. Tr. 216.

Also on September 25, 2003, Martin Kehrli, M.D., completed a physical RFC assessment for DDS. Tr. 217-25. Dr. Kehrli determined that Hubble could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand or walk with normal breaks at least two hours in an eight hour workday, sit with normal breaks for a total of six hours in an eight hour workday, and had unlimited push/pull abilities within the 10 pound lift/carry weight restrictions. Tr. 218. She should only occasionally stoop or climb, but otherwise had no postural, manipulative, visual, communicative, or environmental limitations. Tr. 219-21.

Responding to another OED "request for medical information" on October 5, 2003, chiropractor Vradenburg noted that Hubble was unable to work due severe arthritis in her hip and low back. Tr. 192. He had last seen Hubble in his office on June 19, 2003. *Id.*

On October 7, 2003, Nurse Clegg noted that Hubble had severe chronic arthritis in her back and hips and suffered from morbid obesity, weighing 279 pounds. Tr. 248. In a mood assessment, Hubble indicated that she had been experiencing extreme depression, social anxiety, and difficulty sleeping. Tr. 476. Nurse Clegg noted that Hubble needed to increase her exercise and increased her Lexapro dosage. Tr. 248. In a follow-up mood assessment three weeks later, Hubble reported less depression and social anxiety and much better sleep. Tr. 475.

Chiropractor Vradenburg noted on September 14, 2004, that Hubble was not sleeping well because of dull pain in her hips, which was worse on the left side. Tr. 232. He observed that she walked with a limp. *Id.* She reported pain when walking or driving, but was doing water aerobics and found that the floating helped, as did soaking in a hot tub. *Id.* She was taking pain medication in addition to her Tamoxifen, but did not want hip surgery at that time. *Id.* He opined that she continued to be disabled due to the hip degenerative disc disease. *Id.*

On September 16, 2004, Nurse Clegg recommended that Hubble stop using Ibuprofen for pain because it was affecting her kidneys. Tr. 245. She also noted that Hubble was having difficulty sleeping due to hip pain and prescribed Vicodin. *Id.*

On October 25, 2004, in another OED "request for medical information," chiropractor Vradenburg reported no change since October 3, 2003, and concluded that Hubble was still unable to work. Tr. 231.

At her annual exam on December 13, 2004, Nurse Clegg noted that Hubble was experiencing some numbness in her left fingertips and was still morbidly obese. Tr. 473. She ordered lung and hand x-rays. *Id*. Subsequent left hand x-rays revealed mild soft tissue prominence over the dorsum of the metacarpophalangeal joints and mild interphalangeal joint narrowing. Tr. 479-81. An MRI was recommended for further evaluation. *Id*.

On March 7, 2005, Benjamin F. Balme, M.D., examined Hubble and compared x-rays taken that day to those taken two years earlier. Tr. 259. He diagnosed Hubble with osteoarthritis of the left hip and degenerative disc disease with spondylolisthesis of the lumbar spine, both causing her significant pain. *Id*. He recommended an active exercise program and use of non-steroidal anti-inflammatory medications. *Id*. At that time, he did not recommend surgery, but noted that "the day is coming when she is going to probably end up with a left total hip arthroplasty." *Id*.

In a July 13, 2005, letter to the DHS Vocational Rehabilitation Division ("VRD"), Nurse Clegg noted that Hubble suffered from insulin resistance, morbid obesity, chronic hypertension, and breast cancer. Tr. 470. She also noted that Hubble was limited in her ability to walk, lift, bend, push, pull, and stoop, and would be best suited to a desk job. *Id*.

In a letter dated July 18, 2005, to the VRD, Dr. Balme stated that Hubble suffers from osteoarthritis of the left hip and degenerative disc disease with spondylolisthesis of the lumbar spine. Tr. 460. He further noted that:

> [Hubble] does have significant disability. She, in seeking work, should probably work at a job where she could be on and off her feet, intermittently,but seated throughout most of the shift. I think she should avoid prolonged standing and lifting activities. I would limit any weight lifting to 10 pounds, on an intermittent basis.

*Id*.

On July 29, 2005, chiropractor Vradenburg noted that Hubble's left hip pain was worse after a fall in May 2005.  Tr. 486.  She could not walk or stand for more than five minutes, was experiencing low back pain and needed to take Vicodin during the day and Xanax to sleep at night.  *Id*.  She had a severe limp and used a cane or wheelchair.  *Id*.  He noted that she needed a referral for hip replacement.  *Id*.  That same day he completed a VRD form, diagnosing Hubble with degenerative disc disease and severe arthritis in the hip and low back.  Tr. 487.  He concluded that she was very limited in her functional abilities, needed to be medicated for constant pain, and would benefit from a left hip replacement.  *Id*.  In a physical capacity form, he made similar diagnoses and determined that could only stand or walk for 10 minutes a day and could not lift or carry any weight, climb, balance, stoop, kneel, crouch, or crawl.  Tr. 488.

On October 7, 2005, Hubble reported severe left hip pain to Dr. Balme, who noted osteoarthritis in the left hip with loss of articular cartilage.  Tr. 549.  He observed a 30 degree hip flexion contracture with marked discomfort when trying to extend the hip, and painful and limited internal and external rotation.  *Id*.  He recommended a left total hip arthroplasty.  *Id*.

Dr. Balme performed the left total hip arthroplasty on November 1, 2005.  Tr. 489-94, 543.  At follow-up visits, Hubble made excellent progress, had "excellent range of motion" just a month after surgery, and experienced only mild discomfort.  Tr. 540-42.

On November 8, 2005, Dr. Balme referred Hubble for a left lower extremity venous exam because of complaints of pain and edema in her left lower extremity.  Tr. 466.  No sonographic evidence of deep vein thrombosis or superficial thrombophlebitis was found.  *Id*.

On November 30, 2005, J. Scott Pritchard, D.O., completed a physical RFC assessment for DDS. Tr. 498-505. Dr. Pritchard determined that Hubble could occasionally lift 10 pounds, frequently lift 10 pounds, stand or walk with normal breaks at least two hours in an eight hour workday, sit with normal breaks for a total of six hours in an eight hour workday, and had unlimited push/pull abilities within the lift/carry weight restrictions. Tr. 499. She could only occasionally climb, balance, stoop, kneel, crouch, or crawl, but otherwise had no postural, manipulative, visual, communicative, or environmental limitations. Tr. 500-02. On May 15, 2006, Martin Kehrli, M.D., affirmed the RFC assessment. Tr. 510.

On June 19, 2006, eight months after her hip surgery, Hubble returned to Dr. Balme, complaining of right shoulder pain. Tr. 539. Upon examination, she demonstrated painful but full range of motion and declined a shoulder injection. *Id*. Dr. Balme opined that she suffered from subacromial bursitis. *Id*.

On February 19, 2007, Noriecel Mendoza, M.D., saw Hubble for an initial diabetes evaluation. Tr. 526-28. Hubble had been working out at a Curves gym three to four times a week for the previous three weeks. Tr. 526. On May 7, 2007, Dr. Mendoza diagnosed hyperlipidemia, peripheral neuropathy, and hyperinsulinemia. Tr. 523-25. Hubble expressed interest in gastric bypass surgery, which Dr. Mendoza encouraged. Tr. 525.

On August 6, 2007, Hubble reported that she was working on setting up gastric bypass surgery, making dietary changes, and had improved hyperlipidemia. Tr. 522. She also reported taking Vicodin every four to six hours during the day for pain and Xanax at night to sleep. Tr. 520.

On September 17, 2007, LCSW Margaret A. Skillin performed a psychosocial assessment as part of Hubble's evaluation for gastric surgery. Tr. 551-54. Skillin noted that Hubble reported that she had not worked outside the home for five years and "likes it that way." Tr. 551. She enjoyed reading, crocheting, and making greeting cards. Tr. 554. She reported a history of degenerative disc disease, for which she had used a wheelchair up until her hip surgery. Tr. 552. She reported a history of depression that was stable, as well as a history of cancer, hypertension, and borderline diabetes, all of which were controlled with medication. *Id.* Hubble attributed her obesity to psychological problems such as depression or anxiety. *Id.* Skillin observed no apparent impairment in memory, cognition, or attention, and that while Hubble experienced some depression and anxiety, it did not interfere with her activity level. Tr. 553. Hubble never had the gastric bypass surgery because it was too expensive. Tr. 594, 604.

On October 26, 2007, Dr. Balme wrote a letter on Hubble's behalf to terminate her membership at the Curves gym for medical reasons. Tr. 550. He explained that she was experiencing pain in her right hip, elbow, and lumbar spine that interfered with her ability to participate in an active exercise program. *Id.*

On December 17, 2007, Hubble met with Katherine Davis, D.O., to establish care. Tr. 556-57. She reported anxiety, numbness in her hands, and concerns about her Effexor dosage. Tr. 556. Dr. Davis opined that Hubble suffered from insomnia NOS, uncontrolled Type II diabetes mellitus, essential hypertension, and hyperlipidemia. Tr. 557. She increased Hubble's Effexor dose and scheduled a follow-up in two weeks to address Hubble's anxiety and blood pressure. *Id.*

On February 8, 2008, A. Gregory Cole, Ph.D., completed a medical source statement regarding Hubble's mental ability to perform work-related activities. Tr. 569-70. He concluded that she had moderate limitations in making judgments on work-related decisions and understanding, remembering, and carrying out complex instructions, in her ability to interact appropriately with the public, supervisors, and co-workers, and in her ability to respond appropriately to usual work situations and changes in a routine work setting. *Id.* That same day Dr. Cole completed a psychodiagnostic evaluation. Tr. 572-78. He noted that Hubble was taking Ziac, Effexor, Ibuprofen, Metformin, Xanax, Zyrtec, and Vicodin. Tr. 573. Dr. Cole diagnosed recurrent major depression, anxiety disorder NOS, and pain disorder associated with psychological factors and a general medical condition. Tr. 576. He opined that Hubble would benefit from follow-up psychological services and a chronic pain management treatment program "to teach her skills to more effectively manage her claimed pain symptoms." *Id.* She exhibited problems with attention and concentration, was below average in immediate and delayed memory capacities, gave up easily on tasks, and her overall pace on tasks was slow. Tr. 577. Dr. Cole concluded that Hubble's level of emotional lability and claimed problems with pain and fatigue would be the primary factors that would impact her overall level of vocational success. *Id.* With regard to her alleged pain and fatigue, Dr. Cole recommended further medical evaluation to determine the impact on her specific physical limitations. *Id.*

## DISABILITY ANALYSIS

In construing an initial disability determination under Title II, the Commissioner engages in a sequential process encompassing between one and five steps. 20 CFR § 404.1520; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines whether the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § 404.1520(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR § 404.1520(a)(4)(ii). Absent a severe impairment, the claimant is not disabled. *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR § 404.1520(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 404.1520(a)(4)(iv). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 404.1520(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs

exist in the national economy within the claimant's RFC. *Id.* If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1566.

## **ALJ'S FINDINGS**

At step one, the ALJ concluded that Hubble has not engaged in any substantial gainful activity since the onset of her alleged disability. Tr. 299.

At step two, the ALJ determined that Hubble suffers from the severe impairments of degenerative joint disease status post hip replacement, degenerative disc disease of the lumbar spine, obesity, recurrent major depression, anxiety disorder NOS, and pain disorder with both psychological and general medical condition factors. Tr. 299-300.

At step three, the ALJ concluded that Hubble has no impairment or combination of impairments that meets or equals any of the listed impairments. Tr. 300-01. The ALJ decided that Hubble has the RFC to:

> lift and carry 10 pounds occasionally and less than 10 pounds frequently with push and pull limited to these weights; stand and walk two hours in an eight hour workday; and sit six hours in an eight hour workday. The claimant [is] limited to occasional climbing and stooping. The claimant [has] moderate limitations (defined as more than slight but the claimant can still function satisfactorily) in the following areas: ability to understand, remember and carry out complex instructions; ability to make judgments on complex work-related decisions; ability to interact appropriately with the general public, co-workers and supervisors; and ability to respond appropriately to the usual work situations and to changes in a routine work setting.

Tr. 301.

At step four, the ALJ found that Hubble is capable of performing her past relevant work as a medical biller/collection clerk as performed in the national economy. Tr. 309. Accordingly,

the ALJ concluded that Hubble was not disabled at any point through March 31, 2008, the date last insured  *Id*.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## DISCUSSION

Hubble asserts that the ALJ's decision should be reversed and remanded for an award of benefits because it is not supported by substantial evidence and contains errors of law.  In particular, Hubble contends that the ALJ erred by misidentifying her past relevant work, failing to discuss Listing 1.02, rejecting the medical opinion of chiropractor Vradenburg, rejecting Hubble's testimony regarding the severity of her symptoms, rejecting the testimony of two lay witnesses, and failing to account for obesity and pain disorder in formulating her RFC.

///

## I.  Past Relevant Work

At step four, Hubble challenges the ALJ's misidentification of her past relevant work as one in an insurance office processing claims forms from doctors rather than in a doctor's office processing patient charts and billing.  She contends that this error was material to the ultimate finding of disability because her actual past relevant work was light work and her RFC limits her to sedentary work.

At the most recent hearing on May 22, 2008, the VE testified that Hubble had past relevant work as a medical biller and collection clerk as described by the Dictionary of Occupational Titles ("DOT") 214.482-018.  Tr. 618.  The DOT describes the position title as a "medical-voucher clerk," or alternatively, an "examiner-rating clerk" or "medical-fee clerk." DOT 214.482-018.  The position is designated as occurring in the insurance industry.  *Id*.  As described by that DOT, an employee:

> Examines vouchers forwarded to insurance carrier by doctors who have made medical examinations of insurance applicants, and approves vouchers for payment, based on standard rates.  Computes fees for multiple examinations, using adding machine.  Notes fee on form and forwards forms and vouchers to appropriate personnel for further approval and payment.

*Id*.

At the hearing, the VE classified the work as semi-skilled sedentary work, which involves examining vouchers forwarded to insurance carriers by doctors, approving the vouchers for payment, and computing the fees using an adding machine.  Tr. 618, 620.  The VE admitted that the description was "a little outdated," since the work would now be performed using a computer.  Tr. 620.  Nevertheless, the functions are generally clerical functions performed at a

work station while sitting down.  *Id*.  After being presented with a hypothetical incorporating

Hubble's RFC, the VE opined that Hubble could perform the "medical-voucher clerk" position

as described in the DOT regulations.  Tr. 618-21.

As described by Hubble, her past relevant work at a medical office involved coding,

billing, and filing, which required her to bend, squat, get up and down a lot, walk down

hallways, and sit for long periods of time, all of which cause her pain.  Tr. 111, 271, 434.  She

refers to this position both as "medical biller and collections" (Tr. 111) and as "assistant to the

office manager" (Tr. 434).  The job required her to walk for three hours a day, sit for seven

hours, and write, type, or handle small objects for eight hours.  Tr. 111.  She asserts that a more

accurate classification of her past relevant work as she actually performed it is as a medical

assistant, which is described in the DOT regulations as:

> Performs any combination of following duties under direction of physician
> to assist in examination and treatment of patients:  Interviews patients,
> measures vital signs, such as pulse rate, temperature, blood pressure,
> weight, and height, and records information on patients' charts.  Prepares
> treatment rooms for examination of patients.  Drapes patients with
> covering and positions instruments and equipment.  Hands instruments
> and materials to doctor as directed.  Cleans and sterilizes instruments.
> Inventories and orders medical supplies and materials.  Operates x ray,
> electrocardiograph (EKG), and other equipment to administer routine
> diagnostic test or calls medical facility or department to schedule patients
> for tests.  Gives injections or treatments, and performs routine laboratory
> tests.  Schedules appointments, receives money for bills, keeps x ray and
> other medical records, performs secretarial tasks, and completes insurance
> forms.  May key data into computer to maintain office and patient records.
> May keep billing records, enter financial transactions into bookkeeping
> ledgers, and compute and mail monthly statements to patients.

DOT 079.362-010.

Hubble asserts that this description more accurately describes her activities working in a medical office, since it is designated as occurring in the medical services industry and incorporates a wide range of tasks, including those that she performed, namely recording information on patients' charts, scheduling appointments, receiving money for bills, performing secretarial tasks, completing insurance forms, keeping computer data and billing records, entering financial transactions, and computing and mailing monthly statements to patients. However, these tasks are primarily clerical, and in any event, there is no evidence that she performed any of the specific clerical tasks described in the DOT. *See* Tr. 111, 271, 434. Moreover, the record contains no evidence that Hubble performed any of the more strenuous tasks described in the DOT, such as assisting in the examination and treatment of patients, handling and sterilizing instruments, operating medical equipment, performing laboratory tests, or giving injections and treatments. It is those more strenuous tasks that make the position unique to a medical office and which necessitate a classification of the position as "light work," which "requires walking or standing to a significant degree." *See* DOT 079.362-010. In contrast, the strength required for the position identified by the VE is within Hubble's "sedentary" physical capacity, which "involves sitting most of the time, but may involve walking or standing for brief periods of time." *See* DOT 214.482-018.

It is immaterial to the ALJ's ultimate determination that the position identified by the VE is not performed in a medical office because Hubble could perform her past relevant work as a medical biller and collections clerk as that work is generally performed in the national economy. The DOT is used by the ALJ "in determining the skill levels of a claimant's past work." *Terry v.*

*Sullivan*, 903 F2d 1273, 1276 (9ᵗʰ Cir 1990) (citation omitted).  Here, the VE used the DOT in precisely this way, testifying that a person with Hubble's RFC would be unable to perform the position as she described it, which required significant walking, standing, stooping, and bending, activities which are not consistent with a sedentary RFC.  Instead, the record fully supports the VE's conclusion that Hubble performed the job functions of a medical biller or collections clerk as described by the DOT in her past relevant work at the medical office.  Thus, the ALJ did not err by relying on the VE's testimony.

## II.  Listing 1.02

Hubble contends that the ALJ erred by failing to discuss Listing 1.02.  At step three of the sequential analysis, the ALJ must determine whether the claimant's impairments meet or equal any of the listed impairments considered so severe as to automatically constitute disability. 20 CFR §§ 404.1594(c)(3), 404.1520(d).  The Listing of Impairments describes impairments that the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity," regardless of age, education or work experience.  20 CFR § 404.1525(a).  Thus, a claimant is disabled if his or her impairment meets or is equivalent to a listed impairment. 20 CFR § 404.1520(a)(4)(iii).  An impairment is the equivalent of a listed impairment if the claimant establishes the presence of each characteristic of the listed impairment.  *See Tackett*, 180 F3d at 1099.

Hubble contends that her impairments met or equaled Listing 1.02 because she did not have the ability to ambulate effectively, at least through the date of her total hip replacement

surgery on November 1, 2005, due to severe hip osteoarthritis. Listing 1.02 requires in relevant part:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

29 CFR Pt. 404, Subpt. P, App. 1.

The ALJ specifically stated that he considered Listing 1.00, which encompasses Listing 1.02. Moreover, he addressed the impact of Hubble's documented severe hip osteoarthritis on her ability to ambulate. Tr. 304-05. The record indicates that not until May 2005, when Hubble suffered a fall, did she have such significant difficulties ambulating that she needed to rely upon a cane or wheelchair. Tr. 423, 486. The ALJ discussed in detail Dr. Balme's October 2005 findings that Hubble's condition had deteriorated significantly since March 2005, necessitating a complete left hip replacement. *Id.* Within a month after surgery, Dr. Balme observed that Hubble had excellent range of motion and would no longer need ambulatory assistance. *Id.* Moreover, the ALJ discussed that, almost two years later, in February 2007, Dr. Mendoza observed that Hubble had normal gait and station with no significant abnormalities, providing further evidence that Hubble's condition improved significantly after the hip replacement. *Id.* The ALJ's characterization of the medical evidence regarding Hubble's ability to ambulate is accurately reflected in the record. *See* Tr. 259, 460,

486, 520-22, 526-28, 539-42, 549.  As discussed more fully next, the conflicting testimony

concerning Hubble's ability to ambulate was properly given little weight.  Thus, the ALJ did not

commit any error by concluding that Hubble's impairments did not meet or equal Listing 1.02.

### III.  Treating Chiropractor's Opinion

Hubble asserts that the ALJ improperly rejected the medical opinion of treating

chiropractor Vradenburg.   On at least three occasions, chiropractor Vradenburg opined that

Hubble was fully disabled due to degenerative disc disease of the left hip.  Tr. 192, 193, 231,

487-88   The ALJ rejected Vradenburg's opinion in part because he is not an acceptable medical

source and his opinion conflicted with assessments made by Hubble's other treating physicians

who are acceptable medical sources.  Tr. 303.

Acceptable medical sources are licensed physicians, psychologists, optometrists,

podiatrists, and qualified speech-language pathologists.  20 CFR § 416.913(a).  A chiropractor is

not considered an acceptable medical source.  *Id*.  Consequently, a chiropractor's opinion is not a

medical opinion.  20 CFR § 416.927(a)(2).  Nevertheless, it may be used to evaluate the severity

of a claimant's impairment and how it affects his or her ability to work and, depending on the

particular facts in a case, it may outweigh the opinion of an acceptable medical source, such as if

"he or she has seen the individual more often than the treating source and has provided better

supporting evidence and a better explanation for his or her opinion."  SSR 06-03p, 2006 WL

2329936 (August 9, 2006); *see also* 20 CFR § 416.913(d).

*///*

The ALJ primarily rejected chiropractor Vradenburg's opinion because it conflicted with the other medical evidence in the record.[2] On July 18, 2005, Hubble's treating physician, Dr. Balme, noted that while Hubble suffered from "significant disability," she was not precluded from all work and had the capacity to sustain sedentary work. Tr. 460. The ALJ also noted that this finding is further corroborated by the physical RFC assessment by DDS physicians Pritchard and Kehrli, who also limited Hubble to sedentary work. *See* Tr. 217-25, 498-505. Moreover, all of chiropractor Vradenburg's opinions predated Hubble's hip surgery on November 1, 2005, after which her condition markedly improved. *See* Tr. 540-42. Accordingly, the ALJ did not err by rejecting chiropractor Vradenburg's opinion.

## IV. **Hubble's Credibility**

Hubble argues that the ALJ improperly discounted her testimony regarding the severity of her symptoms. When a claimant's medical record establishes the presence of a "medically determinable impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those symptoms. 20 CFR § 404.1529. In the event the ALJ determines that the claimant's report is not credible, such determination must be made "with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*). Unless the record includes affirmative evidence

---

[2] The Commissioner concedes that the ALJ erred in rejecting chiropractor's Vradenburg's opinion because he did not perform physical examinations of Hubble and did not refer her for surgical intervention. However, this error was harmless because of the numerous other physical examinations and referrals that appear in the record and which the ALJ discussed.

of malingering, the ALJ must offer specific, clear and convincing reasons for rejecting the claimant's testimony about the severity of her symptoms. *Carmickle v. Comm'r*, 533 F3d 1155, 1160 (9th Cir 2008).

When evaluating credibility, the ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen v. Chater*, 80 F3d 1273, 1284 (9th Cir 1996). In weighing a claimant's credibility, the ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations. *Id*. In addition, the ALJ may rely on:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.

*Id*; *see also* SSR 96-7p; 1996 WL 374186 (July 2, 1996).

A finding that a claimant lacks credibility cannot be premised solely on a lack of medical support for the severity of pain. *Lester v. Chater*, 81 F3d 821, 834 (9th Cir 1995). However, a credibility finding supported by substantial evidence in the record cannot be disturbed. *Thomas*, 278 F3d at 959, citing *Morgan v. Comm'r*, 169 F3d 595, 600 (9th Cir 1999).

The ALJ concluded that Hubble's testimony concerning the limiting effects of her symptoms was not credible. Tr. 307-08. Since there is no evidence of malingering, the ALJ was required to provide clear and convincing reasons to reject Hubble's testimony regarding the severity of her symptoms.

In discrediting Hubble's account of the severity of her symptoms, the ALJ noted that the medical evidence did not support the degree of pain alleged. Tr. 308. While the objective diagnostic evidence revealed severe pathology, ultimately necessitating a left hip replacement, the same evidence confirmed that the right hip was not as severe as the left hip had been prior to replacement surgery. Tr. 171, 196, 199, 259.

The ALJ also found that Hubble's account of the limiting effect of her symptoms was undermined by inconsistences between her claims and her behavior. Tr. 307-08. An ALJ may rely upon inconsistences in finding a claimant not credible. *Smolen*, 80 F3d at 1284. The ALJ found it significant that Hubble testified at the initial hearing in November 2004 that she was unable to sit for more than 15-20 minutes without a break (Tr. 381), yet her husband stated that Hubble sat for most of the day (Tr. 437).[3] Moreover, at the initial remand hearing on January 9, 2008, Hubble testified that her right hip pain had increased and that she sometimes had to rely on a cane to walk. Tr. 594-95. However, the ALJ noted that the medical records contained no recommendation for surgical intervention for the right hip or for the use of a cane or other assistive device. Tr. 308. Hubble confirmed that she had not been prescribed a cane or other assistive device. Tr. 590. Prior to her surgery, Dr. Balme diagnosed her only with osteoarthritis of the left hip, never mentioning her right hip at all. Tr. 259, 460. After her hip surgery, he observed she had an "excellent range of motion" and largely experienced only mild discomfort.

---

[3] The ALJ rejected this statement by Hubble's husband because, as discussed more fully next, there was evidence that it had been altered. The statement provided conflicting information, initially indicating that "she does a lot of reading and sitting in her lounge chair," and then in different handwriting that "she can sit & read for about 30 min & then has to get up & move around." Tr. 437. Even adopting the amended version, this is inconsistent with Hubble's hearing testimony regarding the amount of time she can sit before needing a break.

Tr. 539-42. None of the medical records after Hubble's surgery indicate that she had any serious limitations related to her right hip. Tr. 552, 556, 558.

The ALJ also found that Hubble's prior work record undermined her credibility because she worked competitively well into January 2003, despite complaints of pain that were much worse than after her left hip replacement. Tr. 302. An ALJ may consider a claimant's work record in evaluating the credibility of symptom testimony. *Smolen*, 80 F3d at 1284. Hubble's credibility was further undermined by her statements to a social worker in September 2007 that she had not worked for five years and "likes it that way." Tr. 551. Moreover, there is evidence in the record that Hubble left work for reasons other than her impairment, namely that she was laid off due to company restructuring that eliminated her position. Tr. 216, 267. Such evidence is a legally sufficient reason for disregarding pain testimony. *See Bruton v. Massanari*, 268 F3d 824, 828 (9th Cir 2001).

Accordingly, the ALJ gave clear and convincing reasons to discredit Hubble's testimony. The ALJ did not arbitrarily reject Hubble's assertions, but rather, considered proper factors and drew logical inferences supported by a rational interpretation of substantial evidence in the record. Therefore, the ALJ's credibility determination will not be disturbed.

**V.  Lay Witness Testimony**

Hubble argues that the ALJ improperly rejected the testimony of two lay witnesses. Testimony of lay witnesses, including family members, about their own observations regarding the claimant's impairments must be considered by the ALJ. *Smolen*, 80 F3d at 1288. Testimony from lay witnesses who see the claimant on a regular basis is of particular value because they can often ascertain whether the claimant is malingering or truly suffering. *Dodrill v. Shalala*, 12

F3d 915, 919 (9th Cir 1993). If an ALJ chooses to discount the statements of lay witnesses, the ALJ must give "germane reasons." *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001). "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout v. Comm'r*, 454 F3d 1050, 1056 (9th Cir 2006).

The ALJ rejected an October 2003 statement by Mindy Deter that, in the prior five years, Hubble's condition had deteriorated so significantly that performing everyday tasks, such as going to the grocery store, had become extremely difficult for her. Tr. 129. The ALJ rejected this statement because the medical record indicated that during that period, Hubble had been working full-time. Tr. 308. An ALJ may reject a lay witness statement that is inconsistent with the claimant's activities. *See Carmickle v. Comm'r*, 533 F3d 1155, 1163-64 (9th Cir 2008).

The ALJ also rejected an August 2005 report submitted by Hubble's husband because it appeared to have been read by someone else who made changes to several areas that conflicted with allegations made elsewhere in the record. Tr. 307, 437-44. The ALJ noted that these changes, which were made in a different color pen and handwriting, raised the issue of whether the form was filled out by Mr. Hubble based on his own observations and experiences or whether it was altered by someone else. Tr. 307. Hubble asserts that the ALJ improperly rejected this statement by failing to address his concerns at the hearing rather than drawing an adverse credibility inference. However, an ALJ is not required to give an opportunity to explain inconsistences or other factors affecting credibility. *See Tonapetyan v. Halter*, 242 F3d 1144,

1148 (9th Cir 2001). Thus, the ALJ's rejection of Mr. Hubble's August 2005 report was not in error.

However, the Commissioner agrees that the ALJ erred by not providing reasons to reject Mr. Hubble's September 14, 2003 report (Tr. 88-96) and his testimony at the 2004 and 2008 hearings. Tr. 281-83, 601-05. Mr. Hubble's written testimony indicates that Hubble could work a sit-down job until she could not take the pain anymore, and took mediation to sleep at night but was "up and down" all night long. Tr. 88-89. She could only stand for 30 minutes to an hour before needing to rest and could only do light housework, such as laundry and ironing that allows her to sit when the pain gets too bad. Tr. 90. She shopped at a slow pace and could not engage in any prolonged standing. Tr. 91. She had pain doing most tasks, walked less than 50 yards before needing to rest for approximately two minutes, and could lift "maybe 10 pounds." Tr. 93.

At the first hearing on November 18, 2004, Mr. Hubble testified that Hubble had to sit down frequently and took medication just to complete simple tasks like laundry and cooking. Tr. 282. Sometimes she was unable to complete those limited tasks because of the pain. *Id*. He helped her with cleaning and doing the dishes, and often carried things for her. *Id*. At church, Hubble usually had to get up to relieve the pressure in her back. Tr. 282-83.

At the second hearing on January 9, 2008, Mr. Hubble testified that Hubble's pain had grown much worse. Tr. 601. She took medication all the time, appeared to be in a lot of pain and had to lie down much more often. Tr. 602. She had been trying to lose weight with several different diets, but had to stop working out at a gym because it was causing her too much pain. *Id*. As before, he helped her with the housework, meals, and the laundry. Tr. 603. Her

depression had become much worse.  Tr. 605.  She spent a lot of time on her own and often had

to lie down because "she's in so much pain, and mentally, [she is] just worn out."  *Id.*

    While Mr. Hubble's testimony lends support to Hubble's account of her symptoms, even

when fully crediting it as true, it supports a finding that Hubble is capable of performing

sedentary work.  Thus, the ALJ's failure to properly discuss Mr. Hubble's favorable witness

testimony was harmless error because even credited as true, no reasonable ALJ could have

reached a different disability determination.  *See Stout*, 454 F3d at 1056.  Reversal or remand on

this ground is not warranted.

## VI.  RFC Assessment

    Hubble contends that the ALJ erred by failing to account for obesity and pain disorder in

her RFC.  The RFC assessment describes the work-related activities a claimant can still perform

on a sustained, regular and continuing basis, despite the functional limitations imposed by her

impairments.  20 CFR §§ 404.1545(a), 416.945(a); SSR 96-8p.  The ALJ must reach the RFC

assessment based on all the relevant evidence in the case record, including medical reports and

the effects of symptoms, including pain, that are reasonably attributable to a medically

determinable impairment.  *Robbins*, 466 F3d at 883.  The ALJ, however, need not incorporate

limitations identified through claimant testimony or medical opinions that the ALJ permissibly

discounted.  *Batson*, 359 F3d at 1197.

    The ALJ specifically considered Hubble's obesity as a severe impairment, but found no

functional limitations assessed by any treating or evaluating physician as a result.  Tr. 308.

Moreover, based upon Hubble's testimony at the remand hearing that when she was gainfully

employed, her weight was in the 270 pound range, the ALJ concluded that Hubble was still able

to sustain competitive employment despite the combination of obesity, back pain, and bilateral hip osteoarthritis.  *Id.*  The regulations require only that an ALJ consider obesity and its effects when evaluating other impairments.  SSR 02-01p, 2002 WL 31026506 (September 12, 2002).  The ALJ fully complied with this mandate.

The ALJ also satisfied his duty to consider a psychological basis for Hubble's reported degree of pain.  When presented with information that Hubble was taking medication for depression at the remand hearing on January 9, 2008, the ALJ continued the hearing and ordered a consultive diagnostic evaluation.  Tr. 605-07.  The ALJ submitted as supplemental evidence Dr. Cole's February 8, 2008 statement regarding Hubble's mental ability to perform work related activities (Tr. 569-71) and psychodiagnostic evaluation (Tr. 572-78).  Tr. 354.  He conducted a final hearing based on all the evidence in the record.  Tr. 613-23.  Moreover, the ALJ gave Dr. Cole's assessment "great weight," incorporating it into his RFC finding and concluding that Hubble suffered from the severe impairment of pain disorder with both psychological and general medical condition factors.  Tr. 299-301, 306.  Furthermore, the ALJ considered Hubble's account of the severity of her pain, but found her not credible and not supported by the record, as discussed in detail above.  Thus, the ALJ properly took into consideration Hubble's pain disorder as providing a psychological basis for her pain.

The ALJ's finding that Hubble's RFC included the ability to perform sedentary work was supported by substantial evidence, as the ALJ properly took into account those limitations for which support in the record and that did not interfere with her ability to work.  The ALJ's RFC finding was consistent with the overall conclusions of numerous treating and examining

physicians that Hubble was best suited to performing sedentary work. Because the ALJ properly

formulated Hubble's RFC, reversal or remand is not warranted.

## <u>ORDER</u>

For the reasons discussed above, the Commissioner's decision is AFFIRMED.

DATED this 6th day of October, 2010.


s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge